Opinion delivered November 27, 1886.

---

(No. 2209.)

T. E. COOPER *v.* THE STATE.

1. RAPE.—INDICTMENT is sufficient to charge rape if it alleges in general terms that the rape was accomplished by force, or by threats, or by fraud, or by all those means together, and it is not essential that it should allege the character of the force, or specify the threats used.
2. BILL OF EXCEPTION failing to set out sufficiently the facts alleged in an application for a continuance, and the record bringing up no such appli-

cation, the action of the trial court can not be revised by this court, presumption always obtaining in favor of the correctness of the ruling of the trial court, in the absence of a sufficient showing to the contrary.

3. Same—Charge of the Court—Terms Construed.—"The law of the case," as those terms are used in Article 677 of the Code of Criminal Procedure, requiring the court to give a written charge to the jury, means the case as made by the evidence. The evidence as disclosed in this case disclosed a rape accomplished by threats alone, and the charge of the court confining the jury to a rape by threats was correct.

4. Same—Fact Case.—See the statement of the case for evidence *held* sufficient to support a capital conviction for a rape perpetrated by a father upon his own daughter.

Appeal from the District Court of Erath. Tried below before the Hon. T. L. Nugent.

The death penalty was assessed against the appellant in this case upon his conviction for the rape of his own daughter, S. L. Cooper, in Erath county, Texas, on the fifteenth day of July, 1885.

S. L. (or Lula) Cooper, the alleged injured party, was the first witness for the State. She testified that the defendant was her father. Her mother was dead, but the defendant's second wife, her step mother, was still alive. Witness had a brother about eight years old. On Sunday, about the middle of July, 1885, the defendant, his wife, witness and her little brother arrived in Stephenville, Erath county, Texas, and stopped at an old log house belonging to Mr. Hyman, near Mr. Creswell's house. The old log house had three rooms, one of them being a side or shed room attached at the rear. It had three doors, one in the front, one in the back, and one between the main room and the shed room. The parties named retired about their usual hour, but witness could not say what time that was. Witness and her little brother went to bed first on a pallet spread in the main room near the door which led from that into the shed room. They left the defendant and his wife talking together near the front door. The defendant and his wife went to bed on a pallet spread on the floor of the main room near the front door, and on the opposite side of the room from the witness. The foot ends of the two pallets were about two feet, or possibly a little further, apart. Witness went to sleep shortly after she retired. She was awakened during the night by the defendant. She asked who that was, and defendant said: "Hush! It is Pa." He then got on top of witness. Witness wept, and begged de-

fendant to let her alone. He told witness that if she did not hush and lie still he would kill her. He repeated his threats to kill witness if she did not hush and lie still. The witness did not cry out or aloud, because she was afraid to. The witness was lying on her back when the defendant got on top of her. He then placed one hand on the bed, and with his other hand he inserted his male organ into the witness's private parts. He placed his face to witness's face, and motioned his body towards the witness's body, remaining on her about five minutes. During the sexual process he kept his left arm about the witness's neck. The witness felt his male organ in her private organ during the sexual process. Witness cried throughout the operation because it occasioned her great pain. When defendant got off of witness he went back to his own pallet, telling the witness, as he started, that he would kill her if she told any body what had transpired. The witness's little brother was asleep and did not wake up during the perpetration of the outrage. The witness did not know whether her step mother was awake or asleep during that time, but, as she made no movement to indicate that she was awake, witness thought she was asleep. Defendant obtained carnal knowledge of the witness without the consent of the witness and against her will, and over her protests, and in spite of her pleading him to desist. He told witness that he would kill her if she did not hush, and that he would kill her if she did not lie still, and when he went back to his bed after having compelled her, by threats, to submit, he told her that he would kill her if she ever divulged the act to any one.

On the next morning the defendant went up town to work. Witness's step mother put witness to work cleaning out the trash from under the house. The witness's privates were so sore and painful that she could not help crying, which induced her step mother to ask her what was the matter with her. She told her step mother about the treatment her father had subjected her to on the previous night. On the next day (Tuesday) witness and her step mother went to the house of Sam Owens, the son in law of Mrs. Cooper, near Hico. They remained at Sam Owens's two nights and one day. On Thursday they went to Mr. Mose Hurley's house, when Mrs. Cooper told Mrs. Hurley about the outrage perpetrated upon witness by the defendant. On Friday morning the witness told Mr. Hurley all about it. Mrs. Cooper and the witness went back to Stephenville on that same Friday, and attended the defendant's examining trial, which was held

on that day, which was the Friday following the Sunday night of the rape. On that day two doctors, one of whom was Dr. Crow, examined the witness's privates in a small office. Witness's privates were still sore at that time. The defendant was at home on the Tuesday morning when witness and her step mother started to Sam Owens's house. He told his wife not to take the witness either to Sam Owens's or to Mr. Beasley's house, but to take her a long way off so that he could never hear of her again. He said to witness as she left: "Remember who raised you." Witness's little brother was left with the defendant. The witness had no idea what had become of him. Defendant, his wife, witness and her brother went to Sam Owens's house about a month before they went to Stephenville. They had been living at Cleburne for some time before they went to Owens's. Witness went to Mr. Hurley's on the Thursday following the rape, and had been there ever since.

Cross examined, the witness stated that all of the Cooper family did not remain at Sam Owens's house throughout the entire month preceding their removal to Stephenville. During that month Mrs. Cooper and witness visited San Antonio and Austin. Witness did not remember when they visited Austin and San Antonio, but she thought it was in June. They stopped at the Perkins House in San Antonio and at Mrs. Brown's boarding house in Austin, witness and her step mother sleeping together every night. Mrs. Cooper had a paper on which she was begging under the pretense that she was a widow with two young children, and had lost her house by fire, and was making up money to rebuild; all of which the witness knew to be false. The witness was never asked any questions about the truth of the statements contained in the paper, and she never volunteered any information thereupon. They spent two days in San Antonio. Mrs. Cooper and witness were in Stephenville circulating the paper after the Christmas preceding the trial. They did not camp on the Bosque river when they left Stephenville on the occasion of their first visit. They left Stephenville in the afternoon, and camped that night on a creek about five miles from town. Of that fact the witness was as certain as she was that her father ravished her. The first time they visited Stephenville, they came from Granbury. They crossed a creek or river just before they reached Stephenville, and the night before they camped at a house on the road. Mrs. Cooper, while in Stephenville, wore a black worsted dress and a blue veil. Witness was at Mr. Cage's

on the morning they left Stephenville. They left in a two horse hack, one of the horses belonging to Mrs. Cooper and the other to the defendant. Mrs. Cooper's step-brother was with them at that time, and defendant was in Alvarado. Witness did not remember where she and Mrs. Cooper went to from Stephenville, on that occasion. Witness was perfectly well and was not complaining when she left Sam Owens's house to go to Stephenville, just before she was raped. The family, or some of them, stayed at Sam Owens's a month or more. They reached Stephenville late on the evening of the rape, and had coffee, which the witness prepared, before sundown. The defendant joined in partaking of the coffee. The witness knew Mr. Creswell, having seen him two or three times. She saw Mrs. Creswell in Stephenville on Sunday evening after reaching Stephenville, and again on the next morning. The witness could not give the dimensions of the house in which the rape was perpetrated. The front room door faced south and the shed room door faced north, there being a door to the middle room. All of the doors of the house were open on the night of the rape. Witness retired on that night a little after dark, which was before the defendant and his wife retired. The witness made no outcry when her father came to her bed and aroused her. Witness did not know where her step-mother was when the raping occurred, unless she was on the pallet spread down for her and the defendant. The witness did not resist her father, but begged him to desist from his defilement of her person. It was dark in the room, but witness could see a person standing near her. The witness slept in her chemise only. When the defendant came to her pallet he placed one of his hands on her stomach. He then opened her legs, and raised her thighs with one of his hands. Witness's brother's name was W. R. Cooper. The witness knew Messrs. Bibbs, Howell and McDowell.

On her re-examination, the witness said that the defendant knew why his wife and witness went to San Antonio. She saw Mrs. Cooper show him the paper on which she was basing her appeal for alms. Defendant raised no objections to the witness taking that tour with Mrs. Cooper. In saying that she did not resist her father when he came to her bed and raped her, the witness meant that she did not struggle with and fight him. She was afraid to do so, because he threatened to kill her if she did not hush and lie still. She cried and begged him to desist, but to no purpose. Sam Owens did not ask witness at his house if

she and her step-mother had been to San Antonio and Austin, but he did ask Mrs. Cooper. He asked witness if they had been to Cleburne, and witness told him truthfully that they had. It was dark in the room, but witness could have seen any one going in or out of the room. Witness knew that the man who came to her bed and raped her was her father, the defendant. He spoke to witness and witness saw and knew him. He did not leave the room after he got through with the witness, but went back to his pallet. Witness's legs were crossed when her father got on top of her, and he pulled them open with his hands. The compulsory sexual process pained witness very greatly and kept her privates sore for a week. Witness was some months past thirteen years old when she was raped. When witness and her step-mother left Stephenville to go to Sam Owens's on Tuesday morning after the rape they rode one horse, the witness riding behind. They remained at Sam Owens's until Thursday, when they went to Mr. Hurley's, and on Friday they went to Stephenville and attended the examining trial of the defendant. Defendant penetrated the private organ of the witness to the depth of about an inch.

Doctor Ritchie testified, for the State, that he made a medical examination of the private parts of the witness Lula Cooper, on the day of the defendant's examining trial, which was several days after the alleged rape. The examination was made by the witness and Doctor M. S. Crow, in Captain Hyman's office. Witness found Lula's private organ very much swollen, inflamed and bruised. The condition of the organ was such as to render the digital examination very difficult and very painful to the patient. Both the outer and inner lips and the vaginal canal were bruised, congested and inflamed. Witness observed, also, a fluid discharge, but could not tell by a naked eye examination whether or not it was semen. The hymen is located from one to three inches inward from the outside of the external parts of the female organ. It was the witness's professional opinion that the private member of an adult could have penetrated Lula's private organ to the depth of an inch and a half without rupturing the hymen and at the same time have produced the inflammation, congestion and bruises he found on the parts. Witness did not know whether Lula's hymen was ruptured or not, the bruised, swollen and congested condition of her organ rendering a thorough examination difficult and painful in the extreme. Witness did not think that the condition of Lula's organ was the result of mas-

turbation. On the contrary, he thought it the result of applied force. Menstrual flow sometimes produces inflammation and congestion of the parts, but never to the extent manifest in this case. Lula was but a child in stature, constitution and development. After the penetration and laceration of her parts in the manner described by witness they would heal up and become normal. The condition of Lula's organ was inconsistent with the idea of masturbation, because the pain of the process, if so violent as the condition of the organ indicated, would have overcome the sensual craving. It was the professional opinion of the witness that the girl's privates had been penetrated to some extent by the organ of a male person.

Cross examined, the witness testified that the female organ frequently retains semen. Congestion and inflammation in such a case as Lula's would ordinarily reach their height in from twenty-four to thirty-six hours, and would subside in about the same time. The discharge observed by the witness was of blood and mucus, but he could not tell whether or not the mucus was semen. It looked like semen, but witness examined it only with the naked eye. The blood was not clotted. Arterial blood clots, but menstrual blood does not. Inflammation of the private organ of a female can be caused by other means than copulation. If the inflammation was caused by copulation with consent it would not be so great as in this case. The insertion of an adult penis into the privates of a child no larger than Lula would probably produce an outcry. The witness stated, on his re-examination, that two days' horse back riding after such an injury as that inflicted upon Lula would cause the inflammation to last longer and would retard healing. Had the hymen been ruptured the flow of blood, in the opinion of the witness, would have been greater.

Mrs. Mose Hurley testified, for the State, that she knew the girl Lula Cooper, the alleged injured party. Witness heard of the offense some time in July. Lula and her step-mother, the defendant's wife, came to witness's house on the Thursday after the Sunday of the alleged rape. Lula then related to the witness the circumstances of the outrage upon her. Lula went to Stephenville on the next day to attend her father's examining trial.

William Creswell testified, for the State, that he knew the defendant and the prosecuting witness Lula, by sight. The witness first saw them about the middle of July, when they

came to Stephenville. They reached Stephenville on Sunday evening and occupied the old vacant log house belonging to Colonel Hyman, which house was in sight of but some distance from the witness's house. On the next Tuesday evening the witness saw a little boy at that house, crying. Witness and Mr. Chapman went to the house to see what was the matter. To their inquiries if anything was the matter, the defendant replied: "No, the little boy was left .here alone, and is crying about it." Defendant and the little boy were the only persons witness saw at the house on that Tuesday evening.

Doctor M. S. Crow testified, for the State, that, acting upon the request of the county attorney, and assisted by Doctor Ritchie, he made a medical examination of the private organ of the State's witness, Lula Cooper. That examination was made a few days after the alleged rape. He found Lula's genital organs swollen, congested and bruised. Witness's examination extended as far as the hymen, or about one and a quarter inches into the organ. The outer and inner lips of the vagina and the vaginal walls were extended, inflamed and bruised. The condition of Lula's private organ was such as to lead the witness to believe that "a male organ had been thereabouts." The witness did not think the condition of the girl's privates was the result of menstruation or masturbation.

Cross examined, the witness stated that horse back riding if the riding was done astraddle, bare back, on a raw boned horse, might inflame the privates of a female, but not to the extent that Lula's privates were inflamed. Witness discovered no laceration or blood. Had there been copulation there would have been laceration. The witness examined the girl again on the day of this trial and found the hymen intact, and the parts in their normal condition.

Re-examined, the witness stated that by copulation, as he used that word on his cross examination, he meant complete sexual connection between male and female persons. When he first examined Lula he came to the conclusion that her sexual organ had been penetrated by a male organ, and his last examination did not change that opinion. Injuries such as the witness discovered on the person of Lula Cooper could be inflicted by a male organ, and the parts recover and resume their normal condition. Inflammation can subside in thirty-six hours, according to the degree of violence inflicted, and can be protracted by such causes as horse back riding. Lula Cooper was yet a child in

stature, constitution and development, but her sexual organ was large enough to receive that of an adult male. Her hymen was located between one and a quarter and one and a half inches within the vagina.

Mose Hurley testified, for the State, that he first saw Lula Cooper and her step mother when they came to his house on the Thursday evening after the alleged rape, and reported that outrage to him. Witness went with them on the next day to Stephenville, and made complaint against the defendant, charging him with the rape of his own daughter. Lula had since lived in the witness's family. The State closed.

Doctor J. L. May was the first witness for the defense. He testified that he examined the genital organ of Lula Cooper on the day of this trial, and found it in a normal condition. Her private parts were very small—too small to admit the witness's finger as far as the hymen. Witness tried, but failed to introduce beyond the hymen a common sized lead pencil with a rubber end. The girl's parts could have recovered from the alleged injury during the time that elapsed from the alleged perpetration of the offense to the time of this trial. The witness did not believe that the girl had ever been penetrated sufficiently to constitute rape. On his cross examination the witness stated that his first examination of the girl was made on the day of this trial. It was possible that Lula's private organ may have been penetrated by a male organ beyond the *labia majora*, or external lips of the organ.

Mr. Williams testified, for the defense, that he saw Lula Cooper in Stephenville when she and a veiled lady came to Cage's store soliciting alms. The lady claimed to be blind. No man was with them on that occasion. Witness saw them again on the next day in the company of a man.

Bud Riley, the next witness for the defense, testified that early in 1885, he saw a lady and a little girl camped on the creek, a quarter of a mile from town. On the evening of the same day the witness saw the same parties in Stephenville begging. He saw them again on the next morning in a hack accompanied by a man. Cross examined, the witness said he did not see the parties in camp on the creek, but seeing them on the creek he thought they had been camped there. Witness had never seen the parties since.

G. W. Jordan testified, for the defense, that he saw Mrs. Cooper and a little girl begging on the streets of Stephenville

about two months before the alleged rape. He saw no more of them until at the examining trial of the defendant.

Sam Owens testified, for the defense, that he married the daughter of defendant's present wife, and lived fifteen miles southeast of Stephenville. Mrs. Cooper and Lula came to witness's house in July, 1885, the defendant being there when they arrived. Witness asked Lula where she and her step mother had been. She replied that they had been to Cleburne and Alvarado, and no where else. Mrs. Cooper's reputation for chastity was said to be bad. The defendant's reputation for chastity was good. On his cross examination the witness stated that he had never heard the defendant's reputation for chastity discussed one way or the other. He had known defendant about twelve months. Mrs. Cooper told witness in answer to his question, in the presence of Lula, that she and Lula had not been either to Austin or to San Antonio.

Mr. Lane testified, for the defense, that he knew defendant two years in Cleburne, Johnson county, Texas. His reputation for chastity was good. His wife, Annie Cooper, whom he married about a year and a half before this trial, sustained a bad reputation for virtue and chastity. Lula Cooper had associated with Mrs. Cooper closely since her marriage to defendant, and had attended her on several extended trips. On his cross examination, the witness said that he knew the defendant and Miss Annie in Cleburne before their marriage. Mrs. Cooper's reputation for chastity was bad before her marriage to defendant. He had never heard any thing said one way or the other about the defendant's reputation for chastity. Mrs. Cooper's reputation was often discussed in the witness's presence, and pronounced lewd, both before and after her marriage to defendant, but had been oftenest discussed since she married defendant and got to running about the country with the girl. Defendant's first wife died some months before his marriage to his present wife, Annie. Mrs. Annie Cooper and Lula always came back from their trips "full handed."

R. B. McDonald testified, for the defense, that he had known defendant, his wife Annie, and his daughter Lula, about three years. Mrs. Cooper's reputation for chastity was bad, and the defendant's good. On cross examination, the witness said that he had never heard the defendant's reputation discussed. Mrs. Cooper was always considered a regular Jezebel, and her lewdness was common talk. Witness did not know whether the defendant

was apprised of Annie's reputation when he married her, or not. Mr. Bibbs testified substantially as did the witness McDonald.

Lula Cooper, recalled by the defense, testified that she crossed her legs before the defendant got on her. He pressed them apart, and witness made no effort to recross them. Witness was thirteen years old in December, 1884. She had never experienced a menstrual flow. Retained by the State in rebuttal, the defense having closed, the witness said that Sam Owens never asked her if she and Mrs. Cooper had been to Austin and San Antonio. He asked witness if they had been to Alvarado, and she replied that they had not. He then asked if they had been to Cleburne, and she told them that they had. Mrs. Cooper and witness never camped on a stream near Stephenville.

Doctor Crow, recalled by the State in rebuttal, emphasized his previous statement that, though Lula Cooper was a child in stature, constitution and development, her genital organ was sufficiently large to receive an average penis of an adult male person.

The motion for new trial raised the questions discussed in the opinion.

*J. P. Groome* and *M. V. La Beaume*, for the appellant.

*. J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. I. The indictment charges rape accomplished by force and threats, and is in the usual form. (Willson's Cr. Forms, No. 374, p. 167, and cases there cited.) It has never been held necessary that an indictment for this offense should allege the character of the force, or specify the threats used. It is sufficient to allege in general terms that the rape was accomplished by force, or by threats, or by fraud, or by all these means together.

II. There is in the record a bill of exception to the action of the court overruling an application made by defendant for a continuance. There is not however any such application in the record, and, not having the application before us, we are unable to revise this action of the court, as the bill of exception to the ruling upon the same does not disclose sufficient facts to enable us to fully understand and determine the question presented by the bill. As was said by this court in Swift v. the State, 8 Texas Court of Appeals, 614, "the legal presumptions are all in

favor of the correctness of the ruling of the court; and we find no error in the ruling as the matter is here presented, assuming that the facts were as stated in the body of the bill of exceptions and in the explanation of the judge."

III.   We are unable to perceive any error in the charge of the court.   It limits the jury to a consideration of a rape by means of *threats*, omitting to instruct in regard to a rape by means of *force*. This, we think, was correct in view of the facts of the case, Evidently the rape was accomplished by *threats*.   But even if it had been accomplished by *force*, or by both force and threats, the charge was favorable to the defendant, because it limited the finding of the jury to threats alone.   The court is required to give the law applicable to the evidence, and nothing more. (Teague v. the State, 4 Texas Ct. App. 147.)   The words "the law applicable to the case," as used in Article 677 of the Code of Criminal Procedure, requiring the court to give a written charge to the jury, mean *the case as made by the evidence*.   In the case before us, the case as made by the evidence was a rape accomplished by means of *threats*, and the court properly restricted the jury to a consideration of that means alone.   If the court had charged in regard to a rape committed by means of *force*, the defendant would have had good ground of complaint, because the evidence did not warrant such a charge, there being no such force used as would constitute the force defined by the statute.   (Penal Code, Art. 529.)   In regard to threats, the charge of the court is in the exact language of the law (Penal Code, Art. 530), and is sufficient.

IV.   As to the sufficiency of the evidence to support this conviction we must hold that it meets and satisfies the requirements of the law.   It is legally sufficient.   The positive testimony of the injured female fixes the guilt of the horrid crime upon the defendant, her own father.   Her testimony is not contradicted in any essential particular and is corroborated sufficiently to warrant a conviction upon it.   Her credibility was a question for the jury to determine.   They believed her credible or they would not have found the defendant guilty.   It is not the province of this court to pass upon the credibility of witnesses. Whatever uncontradicted and unimpeached testimony a jury has pronounced *credible* we must regard as credible.   While as jurors we might not have been satified as to the credibility of the prosecuting witness and might not have been willing to convict upon her testimony alone, as a court we have no right to con-

sider and determine but the one question, is the evidence legally sufficient to support the conviction? We must regard the evidence before us as true. The jury have said by their verdict it is true, and we must not, in this respect, question the correctness of the verdict. Being true, it is legally sufficient, and there being no error in the conviction the judgment must be and is affirmed. If, as found by the jury, the defendant committed the unnatural, inhuman crime of rape upon his own daughter, a mere child at the time, he certainly deserves to suffer the extreme penalty of the law, and the punishment of death assessed against him can not be said to be excessive.

The judgment is affirmed.

*Affirmed.*

Opinion delivered November 27, 1886.